IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CLEO WESTERFIELD,

        Plaintiff,                       No. CIV S-02-2621 MCE GGH P

    vs.

DR. PENNER, et al.,                 <u>ORDER</u> &

        Defendants.           <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983. Pending before the court are: 1) defendant Dassah's motion for summary judgment, filed on June 27, 2005, to which plaintiff has filed opposition, after which defendant Dassah filed a reply; 2) motion for summary judgment, filed on September 23, 2005, by defendants Peterson, Penner, Borges, Wedell, Sharp, Hooper, Vielbig, Morgan and Cesaro, which plaintiff has opposed; 3) plaintiff's December 13, 2005 "request for judicial notice that he has not received any discovery" responses.

<u>Plaintiff's Allegations</u>

        This action proceeds against defendants Dr. Dassah, Dr. Peterson, Dr. Penner, Dr. Borges, Dr. Wedell, M.T.A. Sharp, Dr. Hooper, C/O Vielbig, M.T.A. Morgan and M.T.A. Cesaro. The allegations of plaintiff's second amended complaint have been previously set forth

1

in the court's Findings and Recommendations, filed on August 11, 2004 (pp. 1-4), adopted by Order, filed on September 28, 2004. The court reproduces the allegations herein, with the application of any subsequent modifications, as appropriate.

      Plaintiff proceeds upon a verified second amended complaint (SAC), filed on April 14, 2003, as modified by order filed on November 26, 2003.[1][2] The original complaint was filed on December 6, 2002. Plaintiff alleges that he has received inadequate medical treatment for his serious heart condition from, inter alia, defendants at California State Prison (CSP)-Sacramento, in violation of the Eighth Amendment. Plaintiff experienced severe chest pains on February 8, 2002, and was carried to the B-facility infirmary where he was examined by defendant Dr. Penner. SAC, p. 7. The examination included an EKG, which revealed serious cardiovascular conditions, an "anterior infarct," which means there are dead or damaged muscles on the heart's surface; "inferior ischemia," a result of too little oxygen reaching the heart; and "T-wave abnormality." Id. Plaintiff also suffers from high blood pressure. Id. The EKG results prompted defendant Penner to fill out a form requesting outside medical care for plaintiff, indicating that the medical attention was reasonable and necessary to protect life. Id. However, plaintiff was not sent to a cardiologist as a result of this request and continued to suffer chest pains. Id.

      On April 12, 2002, plaintiff experienced "very very severe chest pains," at which time he saw defendant Dr. Borges. SAC, p. 7. He told the defendant that on a scale of 1 to 10, with 10 being the most severe, plaintiff felt his pain level was at 7. Id. Defendant Borges took plaintiff's blood pressure which at 204/104 was very high. Id. Defendant Borges said plaintiff was in danger of a heart attack or of stroking out and gave him medication, after which defendant

---

[1] In the November 26, 2003 Order, adopting the September 11, 2003 Findings and Recommendations, Dr. Berliner was dismissed as a defendant from this action.

[2] Verified complaints by pro se defendants may take the place of a declaration. Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000). However, the mere swearing to allegations does not necessarily make the allegations admissible.

1  Borges was shocked when an EKG he took of plaintiff showed that plaintiff had possible heart
2  attack symptoms.  SAC, p. 8.  Defendant Borges put in an urgent request for plaintiff to see an
3  outside cardiologist.  Id.  Plaintiff claims that subsequently he was sent out of the institution five
4  times with each transport being cancelled.  Id.

5        In his first transport on May 5, 2002, to Vacaville State Prison, plaintiff was
6  prepared for a cardiovascular exam but the apparatus malfunctioned and defendant Dr. Dassah
7  became frustrated and told the nurse the examination would be done manually.  SAC, p. 9.
8  Defendant Dassah's manner was unprofessional; he refused to answer plaintiff's questions, a
9  cancellation was noted and plaintiff was returned to Folsom State Prison.

10        On May 14, 2002, plaintiff was sent to see another cardiologist, but plaintiff saw
11  no one and was subjected to another cancellation.  SAC, p. 9.  On May 21, 2002, plaintiff was
12  sent to Manteca Hospital to see a cardiologist, where it took a nurse an hour and a half to realize
13  that plaintiff was supposed to be at a hospital in Modesto.  Id.  When plaintiff finally arrived at
14  the correct hospital in Modesto, the doctor had left and plaintiff was once again not seen by a
15  cardiologist.  SAC, pp. 9-10.  On May 28, 2002, plaintiff was returned to Vacaville, where the
16  equipment was still inoperable and defendant Dassah treated plaintiff indifferently and still
17  refused to give him his name.  SAC, p. 10.

18        On July 17, 2002, 159 days after the first request was made for plaintiff to see a
19  cardiologist and 95 days after the second such request, plaintiff was sent to Fairfield to a small,
20  makeshift clinic with malfunctioning equipment which shut down in the middle of the exam,
21  contributing to the inadequacy of the examination.  Id.  Defendant Dr. Peterson is the chief
22  medical officer at CSP-Sacramento under whose supervision plaintiff's Eighth Amendment
23  rights were violated by the delayed response to the medical necessity requests made on plaintiff's
24  behalf, subjecting plaintiff to the risk of death.  SAC, p. 11.  Plaintiff's only outpatient visit was
25  on July 17, 2002.  SAC, p. 12.  Defendant Dr. Wedell added new entries to plaintiff's file dated
26  July 12, 2002 that were not in the file originally.  Id. Defendant M.T.A. Sharp added

documentation after refusing plaintiff medical attention because she believed M.T.A. Casero, who told her plaintiff was faking and there was nothing wrong with him. Id.

On October 24, 2002, plaintiff experienced chest pains after waiting for five or six days for his medications for his heart condition and high blood pressure. SAC, p. 13. Defendant Wedell allowed the medications to be discontinued even in view of plaintiff's life-threatening condition. Id. Defendant Wedell tried to cover his mistakes with false entries into plaintiff's file. Id. Now that plaintiff has gone forward with litigation, the doctors, including defendant Dr. Hooper, are trying very hard to document their findings in an effort to show there is nothing wrong with plaintiff's heart. SAC, p. 14. From the date of the first request made for plaintiff to see an outside specialist, on February 8, 2002, it took a little more than a year, February 14, 2003, for plaintiff to receive an angiogram. Plaintiff's medication has been changed; plaintiff was given nitroglycerin for 24 hours on February 14-15, 2003. Id. Plaintiff has had some 15 EKG's showing an infarct. SAC, p. 15. On February 14, 2003, defendant Penner signed a Code 2 emergency form stating that plaintiff needed medical attention elsewhere; plaintiff was taken first to a hospital in Folsom then transferred to a hospital in Modesto where the angiogram was taken. Id. On February 15, 2003, defendant OKonski said there was an 80 % chance there was nothing wrong with plaintiff's heart. Id.

Before the medical facility at the institution learned of this litigation, plaintiff was given an EKG every time he had chest pains. SAC, p. 16. Defendant Hooper told an M.T.A, defendant Morgan, who refused to see plaintiff, that Hooper had said plaintiff probably had gas or indigestion. Id. Ironically, defendant Hooper was the doctor on duty at the time of the Code 2 emergency call for plaintiff, even though he apparently believed there was nothing wrong with plaintiff. Id. On January 3, 2003, defendant C/O Vielbig ignored plaintiff's requests for help when plaintiff thought he was having a heart attack. Id. Plaintiff seeks injunctive relief and money damages.

\\\\\

1  <u>Motion for Summary Judgment</u>

2        <u>Legal Standard for Summary Judgment</u>

3          Summary judgment is appropriate when it is demonstrated that the standard set
4  forth in Fed. R. Civ. P. 56(c) is met. "The judgment sought shall be rendered forthwith if . . .
5  there is no genuine issue as to any material fact, and . . . the moving party is entitled to judgment
6  as a matter of law." Fed. R. Civ. P. 56(c).

7          Under summary judgment practice, the moving party

8        always bears the initial responsibility of informing the district court
        of the basis for its motion, and identifying those portions of "the
9        pleadings, depositions, answers to interrogatories, and admissions
        on file, together with the affidavits, if any," which it believes
10      demonstrate the absence of a genuine issue of material fact.

11 <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986). "[W]here the
12 nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary
13 judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers
14 to interrogatories, and admissions on file.'" <u>Id</u>. Indeed, summary judgment should be entered,
15 after adequate time for discovery and upon motion, against a party who fails to make a showing
16 sufficient to establish the existence of an element essential to that party's case, and on which that
17 party will bear the burden of proof at trial. <u>See id.</u> at 322, 106 S. Ct. at 2552. "[A] complete
18 failure of proof concerning an essential element of the nonmoving party's case necessarily
19 renders all other facts immaterial." <u>Id.</u> In such a circumstance, summary judgment should be
20 granted, "so long as whatever is before the district court demonstrates that the standard for entry
21 of summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id.</u> at 323, 106 S. Ct. at 2553.

22         If the moving party meets its initial responsibility, the burden then shifts to the
23 opposing party to establish that a genuine issue as to any material fact actually does exist. <u>See</u>
24 <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356
25 (1986). In attempting to establish the existence of this factual dispute, the opposing party may
26 not rely upon the allegations or denials of its pleadings but is required to tender evidence of

specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255, 106 S. Ct. at 2513. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S.Ct. 1356 (citation omitted).

On multiple occasions, by orders filed on September 25, 2003, August 11, 2004, September 24, 2004, and January 5, 2005, the court has advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

Defendant's Contentions

Defendant Dassah sets forth the following as undisputed material facts (UMF). See defendant Dassah's Separate Statement of Undisputed Material Facts. Since 1988, defendant Dr. Harry Dassah has worked as a California Department of Corrections (CDC) cardiology consultant, during which time he was asked to provide consultation services to Folsom State Prison. UMF 1, Dassah Declaration (Dec.), ¶ 4. Defendant Dassah held clinic on the Folsom State Prison's premises to see inmates referred for cardiac evaluations. Id. Defendant Dassah saw plaintiff several times in the clinic for evaluation of reported chest pain episodes and to treat his high blood pressure. Id. To evaluate his chest pain, plaintiff was asked to undergo a treadmill stress test on July 17, 2002 in defendant's office, which was completed uneventfully.[3] Id. Plaintiff exercised for eight minutes to a heart rate of 172 beats per minute on rigorous Bruce protocol. Id. Defendant Dassah reported the test as equivocal for ischemia and recommended continuing medical therapy because there were no apparently compelling changes that needed a coronary angiogram to look at plaintiff's heart arteries at that time. Id.

As UMF 2, defendant states that plaintiff continued to be seen in the cardiac clinic without any significant chest pain episodes. Dassah Dec., ¶ 5. In January, 2003, defendant Dassah recommended a nuclear imaging test at the University of [California at] Davis Medical

---

[3] Aside from his declaration, defendant produces no objective evidence in the form of a medical report or form indicating any such test took place.

Center.[4]  Id. On February 14, 2003, plaintiff was evaluated for chest pain in the emergency room at Mercy Hospital at Folsom and then transferred to the Doctor's Hospital in Modesto where he underwent a coronary angiogram by Dr. John C. Merillat on February 15, 2003.  Id., & Exh. D to Bisbee Dec., Report of 2/15/03 Coronary Angiography of plaintiff by Dr. Merrilat.  Plaintiff was found to have normal heart function and normal coronary arteries with no blockages.  His heart muscle function was 80%.  Id.  Eighty per cent is "excellent function."  Dassah Dec., ¶ 5. Defendant also noted that on April 21, 2003, plaintiff was referred to Doctor's Hospital in Manteca, where he underwent a cardiac nuclear stress test which was reported as negative for coronary artery disease.  Id., & Exh. D & E, 4/21/03 Radiology Report by Dr. Anil Sain at Doctors Hospital of Manteca.

In UMF 3, defendant states that plaintiff has atypical chest pain which was evaluated with the appropriate tests available without finding evidence of coronary artery blockage, requiring continued medical therapy consistent with defendant Dassah's initial impression and recommendation following his July 17, 2002 treadmill test.  Dassah Dec., ¶ 6. Defendant believes that plaintiff's cardiac care has been "very good, and that his chest pains have been evaluated with due concern for his health."  Id.  Defendant Dassah notes that plaintiff's medical records dated December, 2004[5] indicate that plaintiff is "'working out, feels well,'" and denies exertional chest pain.  Id., & Bisbee Dec., Exh. E, 9/16/04 Consultation Report by Dr. Leslie Baluyat of Doctors Hospital Manteca.

Defendant states as UMF 4 that defendant served plaintiff with special interrogatories on April 11, 2005, in which interrogatory no. 4 requested of plaintiff that he state the name of any medical practitioner who had advised him that Dassah acted with deliberate indifference to plaintiff's serious medical needs.  Bisbee Dec., Exh. B, defendant Dassah's

---

[4] The court notes that defendant Dassah presents no medical record in support of this averment in his declaration.

[5] The report is dated September 16, 2004, not December, 2004.

8

special interrogatories, Set One, served on April 11, 2005.

Defendant's UMF 5 sets forth that plaintiff's response was: "No one has advised the responding party in any part of this litigation." Bisbee Dec., Exh C, plaintiff's April 24, 2005 responses to Dassah's special interrogatories, set one.

Defendant Dassah contends that he is entitled to summary judgment because "there is an absence of expert testimony" to support plaintiff's claims against him. Motion for Summary Judgment (MSJ), p. 5. Defendant avers that he has met his initial burden of demonstrating that there is such an absence, pointing to plaintiff's response to special interrogatory no. 4, requesting the name of any medical provider who plaintiff believes holds the opinion that defendant Dassah acted with deliberate indifference to plaintiff's medical needs. MSJ, pp. 5-6. Special Interrogatory No. 4, propounded by defendant Dr. Dassah:

> Please state the name, address and telephone number of any medical practitioner, if any, who has advised YOU that propounding party acted with deliberate indifference to YOUR serious medical needs.

MSJ, Declaration of Matthew Bisbee, counsel for defendant (Bisbee dec.), Exhibit (Exh.) B, defendant Dassah's special interrogatories, Set One, served on April 11, 2005.

Plaintiff's response, underlined for emphasis in the original is as follows:

> <u>No one has advised the responding party in any part of this litigation.</u>

MSJ, pp. 3, 6, Bisbee Dec., Exh C, plaintiff's April 24, 2005 responses to Dassah's special interrogatories, set one. Defendant draws the inference from this sworn discovery response that plaintiff admits that he has no medical expert to support his case, and, therefore, cannot prove an essential element of his claim—deliberate indifference to plaintiff's serious medical needs by this defendant—entitling plaintiff to summary judgment as a matter of law. MSJ, p. 6. Defendant also contends that plaintiff alleges no injury or damage stemming from the inadequate or delayed medical treatment plaintiff has alleged. MSJ, p. 7, Bisbee Dec., Exh. A, second amended

complaint. Plaintiff was found to have normal heart function and normal coronary arteries on February 15, 2003, about six months after defendant Dassah conducted a July 17, 2002 treadmill test and in December, 2004, plaintiff's medical records indicate that he was "working out and feels well." MSJ, p. 7. Thus, because plaintiff has pled no injury or damage due to the alleged inadequate or delayed medical care and the undisputed evidence shows no injury or harm to plaintiff, there is no evidence that the inadequate treatment alleged caused substantial harm to plaintiff. MSJ, p. 7.

Opposition

    Plaintiff re-emphasizes, as he did in his operable amended complaint, that defendant Dassah had three off-site opportunities to provide an adequate medical facility with operable equipment: on May 5, 2002, May 28, 2002, and on July 17, 2002. Opposition (Opp., pp. 1-4). Plaintiff avers that defendant Dassah, on the first two occasions when the equipment for a cardiovascular examination malfunctioned, appeared agitated, ill-tempered, apparently frustrated about the malfunctioning apparatus, ignoring the plaintiff's questions and concerns, and acting in a manner that was openly dismissive of plaintiff. Id. On the third occasion, July 17, 2002, the only one of the three occasions that, as plaintiff notes, defendant Dassah has referenced, the apparatus once again malfunctioned, after defendant had had notice on the two prior occasions of its defectiveness, a situation that plaintiff avers evidences deliberate indifference. Opp., p. 3. Apparently, the defendant did conduct a stress (ETT) test, the treadmill test Dassah references, but he was once again unable to obtain an electro-cardiogram.[6] Id.

    Plaintiff includes as Exhibit A, a copy of an August 9, 2004, second level emergency appeal response, which is a partial grant signed by CSP- Sacramento's Chief Medical Officer, John Howard, (not a defendant) and which, inter alia, includes the following statement:

---

[6] Plaintiff is not entirely clear about the equipment which kept malfunctioning, but in his references to electrodes being attached and his need for a cardiological examination, it is apparent that he is referring to an inability for an EKG, or electro-cardiogram, to be obtained on these three occasions.

"You do have a history of chest pain relieved by nitroglycerin and EKGs that show either an anterior wall heart attack or middle wall heart attack."  Plaintiff makes the following note on the exhibit: "undeniable proof a [sic] expert has confirmed plaintiff's contentions."

Moreover, plaintiff avers that this defendant had knowledge of a substantial risk to the plaintiff's health as defendant Dassah had seen EKG's showing the existence of an anterior infarct.  Id.  Plaintiff goes on to state that on February 8, 2002, defendant Dr. Penner performed an EKG (or ECG) on plaintiff which showed that an anterior infarct was present.  Opp., p. 4.  On January 3, 2003, another defendant, Dr. Borges, administered an EKG, the results of which confirmed the existence of an anterior infarct; however, the age of the attack could not be confirmed.  Opp., p. 4.  Exhibit E is plaintiff's copy of a 1/3/03 ECG, which though not properly authenticated, appears genuine, which reads, in part, "possible anteroseptal infarct, age undetermined... Abnormal ECG...."  Another document in Exh. E, p. 2. appears to show an "abnormal ECG" noting an "anterior infarct (cited on or before 23 May 2001)."  The May 23, 2001 "Abnormal ECG" notes a "septal infarct, age undetermined...Abnormal ECG." Exh. E, p. 3.  Plaintiff includes various other unauthenticated documents.  Fed. R. Civ. P. 56(e) provides in relevant part that,

> Supporting...affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.  Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith...

"It is well established that unauthenticated documents cannot be considered on a motion for summary judgment."  Hal Roach Studios v. Feiner, 896 F.2d 1524, 1550 (9th Cir. 1989).  "To be considered by the court 'documents must be authenticated by and attached to an affidavit that meets the requirements of [Rule] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.'"  Id., quoting Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987).  "A document which lacks a proper foundation to authenticate it cannot be used to support a motion for summary judgment."  Id..

11

The copies of what appear to be medical records that plaintiff has attached to his opposition and separate statements are not properly authenticated. Accordingly, the court may not consider them in evaluating defendants' motion. King v. Aliyeh, 814 F.2d 565, 567 (9th Cir. 1987) (pro se litigants must follow the same rules of procedure that govern other litigants). This court is not in a position to interpret medical tests, even if the documents were properly authenticated. On the other hand, the court will consider the statement included in the August 9, 2004 response, wherein the CMO states that plaintiff has a history of chest pain and evidence of some form of a heart attack.

Reply

In his reply, defendant Dassah makes no reference to the events described by plaintiff, including the three occasions on which plaintiff alleges the electro-cardiogram apparatus mal-functioned and defendant's unprofessional attendant behavior, neither confirming or denying such incidents or conduct. Defendant merely reiterates that plaintiff has presented on medical expert to support his claim that defendant Dassah acted with deliberate indifference to plaintiff's serious needs. As to plaintiff's Exhibit A, defendant avers that co-defendant Dr. Penner did not state that he believed that Dassah acted with deliberate indifference toward plaintiff's medical condition. Reply, pp. 1-2. Defendant re-emphasizes that in December, 2004,[7] after defendant's "delayed" treatment, plaintiff was performing exercises and apparently feeling "fine."

Legal Standard for Eighth Amendment Claim

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively

---

[7] As noted, the report is dated September, not December, 2004.

serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Indications that a prisoner has a serious need for medical treatment are the following:  the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978. However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

It is nothing less than recklessness in the criminal sense––a subjective standard–– disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at 1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837, 114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at

847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. If the risk was obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42, 114 S. Ct. at 1981. However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry. McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant." McGuckin, 974 F.2d at 1061.

Superimposed on these Eighth Amendment standards is the fact that in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish the necessary level of deliberate

14

1 indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

2 may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

3 treatment he received equated with deliberate indifference thereby creating a material issue of

4 fact, summary judgment should be entered for defendants.  The dispositive question on this

5 summary judgment motion is ultimately <u>not</u> what was the most appropriate course of treatment

6 for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

7 criminally reckless.

Discussion

This is a troubling case in that, even though plaintiff has not been able to provide authentication and expert testimony in support of his allegations against this defendant, a not infrequent consequence simply of being a prisoner proceeding pro se,[8] defendant Dassah relies almost solely on plaintiff's omission, rather than obtaining any expert evidence/testimony, other than his own, as to the appropriateness of his treatment of plaintiff.  Defendant does not even seek to address plaintiff's descriptions of several of his encounters with plaintiff, which go unrefuted by defendant.  However, this defendant has conceded that he saw plaintiff from mid-2002 to mid-2003 for "reported chest pain episodes and to treat his high blood pressure."

---

[8] Although the court denied plaintiff's single request for appointment of counsel, the decision was predicated in no small part on the apparent dearth of voluntary counsel available for prisoner civil rights actions in this division of the Eastern District of California.  See Orders, of which this court takes judicial notice, filed on 1/13/06 in Pogue, et al.,  v. Woodford, et al., Case No. CIV-S-05-1873 MCE GGH P; on 1/4/06 in Consiglio v. Woodford in Case No. CIV-S-05-1701 GEB GGH P; on 12/23/05 in Allison v. Khoury, et al., Case No. CIV- S-05-0547 GEB GGH P; on 10/25/05 in Lynn v. Argro, Case No. CIV-S-04-0543 LKK GGH P; on 9/20/05 in Jennings v. Faulker, et al., Case No. CIV-S-04-2131 GEB GGH P; also on 9/20/05 in Meyers v. Pope, et al., Case No. CIV-S-03-0241 LKK GGH P.  These are some of the cases in which the King Hall Civil Rights Clinic, did not respond to orders (often repeated) to inform the court as to whether the case at issue was appropriate for counsel and whether they would be able to represent the plaintiff prisoner.  This note only references cases assigned to the undersigned and even at that does not include the number of cases so assigned wherein the clinic has actually responded but indicated that their docket is too full to accept appointment of counsel.
    Moreover, neither the undersigned, nor the court, maintains a list of available attorneys.  On several occasions, the court has attempted to interest attorneys into becoming members of a pro bono panel, to no avail.  There are simply no volunteer counsel for this type of case at the trial level.  Nor will the undersigned beg and cajole attorneys to take the case.

1  Defendant does not include medical report documentation in support of his declaration that he
2  recommended a nuclear imaging test at UCD Med Center in January 2003, nor does he state why
3  he felt there was such a need. He also does not make clear how much he knew of plaintiff's
4  relevant medical history, whether or not plaintiff was complaining of significant chest pain on
5  some of the unspecified occasions when plaintiff was seen by him. Defendant does adequately
6  demonstrate that plaintiff did not experience any significant injury during or since his treatment
7  of plaintiff, a consequence that may have been simply plaintiff's (and defendant's) good fortune.

8   The problem for plaintiff is that, although he has set forth many issues of disputed
9  fact, he has not submitted properly authenticated documents which might demonstrate that he
10 was subjected to deliberate indifference by this defendant to a serious medical condition.
11 Without such authentication, and expert interpretive declarations, plaintiff cannot meet his
12 burden to show there is a genuine issue as to a material fact. Plaintiff has raised some issues of
13 fact as to the manner of his treatment by this defendant, but they are insufficient in this context.
14 Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) ("[w]hile poor medical treatment
15 will at a certain point rise to the level of constitutional violation, mere malpractice, or even gross
16 negligence, does not suffice"). Moreover, plaintiff has not been able to demonstrate that he has
17 suffered injury from his treatment, delayed or otherwise inadequate, by this defendant. The court
18 is bound to recommend summary judgment in favor of defendant Dassah because plaintiff is
19 unable to meet his burden to show that any treatment, or lack thereof, that he received from this
20 defendant caused him harm. Id., at 1335.

21 Remaining Motion

22  As to the September 23, 2005 motion for summary judgment brought on behalf of
23 the other defendants, Peterson, Penner, Borges, Wedell, Sharp, Hooper, Vielbig, Morgan and
24 Cesaro, plaintiff has filed a document entitled "Request For Judicial Notice Plaintiff Has Not
25 Received Any Discovery." Plaintiff appears to be seeking an order to compel discovery from
26 unnamed defendants. It is not clear whether he has ever properly served his requests upon

defendants. Once defendants have been served, and if defendants do not respond timely, or if plaintiff has a valid objection to any response, only then may plaintiff file a motion to compel discovery from any defendant. If defendants have filed a response plaintiff finds deficient, plaintiff must include it with any motion to compel discovery, wherein he sets forth how the response is deficient, a copy of both his discovery request(s) and defendants' response(s) to the request(s) that are at issue. If defendants have failed to respond altogether to plaintiff's properly served discovery requests, plaintiff must identify each defendant who has failed to respond and what discovery he has served upon any defendant and on what date(s).

Plaintiff's recent filing indicates that he has been confused by the court's admonishments that he should not file his discovery requests in court until they are at issue, i.e., until he finds a response deficient or he has received no discovery response at all and the time for response has expired. See Orders filed on 2/8/05 and 6/15/05. Plaintiff is too vague as to which defendants have failed to respond to his discovery requests. Defendant Dr. Dassah filed a motion for summary judgment, on June 27, 2005, addressed supra, to which plaintiff filed an opposition on July 12, 2005, and wherein he posited no discernible complaint about access to discovery at any appropriate time; therefore as to this defendant, the court deems any such complaint herein both deficient and excessively dilatory.

Defendants Peterson, Penner, Borges, Wedell, Sharp, Hooper, Vielberg, Morgan and Cesaro, however, filed their motion for summary judgment, as noted, on September 23, 2005, to which plaintiff filed his opposition on October 5, 2005, but for which he did not file proper proof of service until November 10, 2005.

Plaintiff's representation that, while he has provided (some or all) defendants with his discovery responses, some or all defendants have failed to respond to his discovery requests should have been brought to the attention of the court earlier. See Scheduling Order filed on March 24, 2005, setting discovery deadline of June 10, 2005. On the other hand, since the filing of the scheduling order, the court granted defendants Peterson, Penner, Borges, Wedell, Sharp,

Hooper, Vielberg, Morgan and Cesaro an extension of time to file their motion for summary judgment and vacated the dates for the pretrial conference and trial, pending adjudication of the pending dispositive motions.  See Orders, filed on 8/3/05 and 10/12/05.

It now appears that plaintiff's representation implicates Fed. R. Civ. P. 56(f).[9] Although unaccountably belated, plaintiff has implicitly raised the specter, with his assertion that some or all defendants have provided him with no discovery responses, that he has not been provided with information that might be deemed essential for him to justify his opposition to the pending motion filed on 9/23/05.  In light of the circumstances, plaintiff's apparent inability to comprehend the undersigned's prior cautions about not filing discovery requests with the court until they become at issue and the glaring potential for troubling issues on any appeal that might ensue, the following directives must issue.

Accordingly, IT IS ORDERED that:

1. The court vacates the discovery deadline in this matter with respect to plaintiff's discovery issues and plaintiff must file any motion to compel discovery within 20 days of the date of filing of this order, wherein he must include the relevant information as set forth above;

2. If he seeks a continuance with respect to his opposition to the pending 9/23/05 summary judgment motion, based on his having received no (or inadequate ) discovery responses from defendants Peterson, Penner, Borges, Wedell, Sharp, Hooper, Vielberg, Morgan and/or Cesaro, he must move for such a continuance in an affidavit or declaration in accordance with the requirements of Fed. R. Civ. P. 56(f), and must do so within 20 days of the filing date of this order;

---

[9] "Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

3. Defendants Peterson, Penner, Borges, Wedell, Sharp, Hooper, Vielberg, Morgan and Cesaro will have 15 days, should plaintiff properly file and serve either or both of the above motions, to file their response(s), after which any such motions will be deemed submitted;

4. Plaintiff is cautioned that his failure to comply fully with this order, and the 20-day deadline set forth herein, will result in this court's adjudication of the pending dispositive motion without further consideration granted to plaintiff's representations as to any defendant's discovery responses or lack thereof.

IT IS HEREBY RECOMMENDED that defendant Dassah's motion for summary judgment, filed on June 27, 2005 be granted, and judgment be entered for this defendant.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, plaintiff may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 2/3/06

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:009
west2621.msj