1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CLEO WESTERFIELD,

11            Plaintiff,                     No. CIV S-02-2621 MCE GGH P

12       vs.

13   DR. PENNER, et al.,

14            Defendants.              FINDINGS AND RECOMMENDATIONS

15   _____/

16            Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. §

17   1983.  Pending before the court is a motion for summary judgment, filed on September 23, 2005,

18   by defendants Peterson, Penner, Borges, Wedell, Sharp, Hooper, Vielbig, Morgan and Cesaro,

19   which plaintiff opposed on October 5, 2006; the court will also consider plaintiff's opposition, to

20   the extent that it is not duplicative, filed on October 21, 2006.[1]

21   _____

22       [1] By Order, filed on February 3, 2006, in response to plaintiff's apparent effort to seek an
     order to compel discovery from unnamed defendants wherein it appeared that Fed. R. Civ. P.
23   56(f), the court vacated the discovery deadline as to plaintiff in order to resolve his discovery
     issues and plaintiff was informed as to how to proceed, should he seek to file a motion to compel
24   discovery and a continuance with respect to his opposition to the September 23, 2005, motion for
     summary judgment.  See Order & Findings and Recommendations, filed on Feb. 3, 2006, pp. 16-
25   19.  Plaintiff was granted 20 days in order to comply with the order, but failed to do so.  A
     document entitled "Objections to the Findings and Recommendations," filed on February 24,
26   2006, was not responsive, and in fact, could only be construed as denominated, that is, as
     objections to the February 3, 2006, Findings and Recommendations, considered by the district

Plaintiff's Allegations

This action proceeds against defendants Dr. Peterson, Dr. Penner, Dr. Borges, Dr. Wedell, M.T.A. Sharp, Dr. Hooper, C/O Vielbig, M.T.A. Morgan and M.T.A. Cesaro.  The allegations of plaintiff's second amended complaint have been previously set forth in the court's Findings and Recommendations, filed on August 11, 2004 (pp. 1-4), adopted by Order, filed on September 28, 2004, and in Findings and Recommendations, filed on February  3, 2006, as adopted by Order, filed on March 30, 2006 (pp. 1-4).  The court reproduces the allegations herein, with the application of any subsequent modifications, as appropriate.

Plaintiff proceeds upon a verified second amended complaint (SAC), filed on April 14, 2003, as modified by order filed on November 26, 2003.[2][3]  The original complaint was filed on December 6, 2002.  Plaintiff alleges that he has received inadequate medical treatment for his serious heart condition from, inter alia, defendants at California State Prison (CSP)-Sacramento, in violation of the Eighth Amendment.  Plaintiff experienced severe chest pains on February 8, 2002, and was carried to the B-facility infirmary where he was examined by defendant Dr. Penner.  SAC, p. 7.   The examination included an EKG, which revealed serious cardiovascular conditions, an "anterior infarct," which means there are dead or damaged muscles on the heart's surface; "inferior ischemia," a result of too little oxygen reaching the heart; and "T-wave abnormality."  Id.  Plaintiff also suffers from high blood pressure.  Id.  The EKG results

---

judge before granting the June 27, 2005, motion for summary judgment for defendant Dr. Dassah.  See Order, filed on March 30, 2006.   His other two filings on February 24, 2006, "Objections to the motion for summary judgment" and plaintiff's declaration in opposition to the September 23, 2006, motion for summary judgment by the remaining defendants, are supplemental opposition filings and cannot be considered by the court because they were filed well beyond the time for doing so.

[2] In the November 26, 2003 Order, adopting the September 11, 2003 Findings and Recommendations, Dr. Berliner was dismissed as a defendant from this action.

[3] Verified complaints by pro se defendants may take the place of a declaration.  Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000).  However, the mere swearing to allegations does not necessarily make the allegations admissible.

1  prompted defendant Penner to fill out a form requesting outside medical care for plaintiff,

2  indicating that the medical attention was reasonable and necessary to protect life.  Id.  However,

3  plaintiff was not sent to a cardiologist as a result of this request and continued to suffer chest

4  pains.  Id.

5          On April 12, 2002, plaintiff experienced "very very severe chest pains," at which

6  time he saw defendant Dr. Borges.  SAC, p. 7.  He told the defendant that on a scale of 1 to 10,

7  with 10 being the most severe, plaintiff felt his pain level was at 7.  Id.  Defendant Borges took

8  plaintiff's blood pressure which at 204/104 was very high.  Id.  Defendant Borges said plaintiff

9  was in danger of a heart attack or of stroking out and gave him medication, after which defendant

10 Borges was shocked when an EKG he took of plaintiff showed that plaintiff had possible heart

11 attack symptoms.  SAC, p. 8.  Defendant Borges put in an urgent request for plaintiff to see an

12 outside cardiologist.  Id.  Plaintiff claims that subsequently he was sent out of the institution five

13 times with each transport being cancelled.  Id.

14         In his first transport on May 5, 2002, to Vacaville State Prison, plaintiff was

15 prepared for a cardiovascular exam but the apparatus malfunctioned and defendant Dr. Dassah[4]

16 became frustrated and told the nurse the examination would be done manually.  SAC, p. 9.

17 Defendant Dassah's manner was unprofessional; he refused to answer plaintiff's questions, a

18 cancellation was noted and plaintiff was returned to Folsom State Prison.

19         On May 14, 2002, plaintiff was sent to see another cardiologist, but plaintiff saw

20 no one and was subjected to another cancellation.  SAC, p. 9.  On May 21, 2002, plaintiff was

21 sent to Manteca Hospital to see a cardiologist, where it took a nurse an hour and a half to realize

22 that plaintiff was supposed to be at a hospital in Modesto.  Id.  When plaintiff finally arrived at

23 the correct hospital in Modesto, the doctor had left and plaintiff was once again not seen by a

24 cardiologist.  SAC, pp. 9-10.  On May 28, 2002, plaintiff was returned to Vacaville, where the

25

26         [4] Summary judgment was entered for defendant Dassah by Order, filed on March 30,
   2006.

3

equipment was still inoperable and (former) defendant Dassah treated plaintiff indifferently and still refused to give him his name.  SAC, p. 10.

On July 17, 2002, 159 days after the first request was made for plaintiff to see a cardiologist and 95 days after the second such request, plaintiff was sent to Fairfield to a small, makeshift clinic with malfunctioning equipment which shut down in the middle of the exam, contributing to the inadequacy of the examination.  Id.  Defendant Dr. Peterson is the chief medical officer at CSP-Sacramento under whose supervision plaintiff's Eighth Amendment rights were violated by the delayed response to the medical necessity requests made on plaintiff's behalf, subjecting plaintiff to the risk of death.  SAC, p. 11.  Plaintiff's only outpatient visit was on July 17, 2002.  SAC, p. 12.  Defendant Dr. Wedell added new entries to plaintiff's file dated July 12, 2002 that were not in the file originally.  Id.  Defendant M.T.A. Sharp added documentation after refusing plaintiff medical attention because she believed M.T.A. Casero, who told her plaintiff was faking and there was nothing wrong with him.  Id.

On October 24, 2002, plaintiff experienced chest pains after waiting for five or six days for his medications for his heart condition and high blood pressure.  SAC, p. 13.  Defendant Wedell allowed the medications to be discontinued even in view of plaintiff's life-threatening condition.  Id.  Defendant Wedell tried to cover his mistakes with false entries into plaintiff's file.  Id.  Now that plaintiff has gone forward with litigation, the doctors, including defendant Dr. Hooper, are trying very hard to document their findings in an effort to show there is nothing wrong with plaintiff's heart.  SAC, p. 14.  From the date of the first request made for plaintiff to see an outside specialist, on February 8, 2002, it took a little more than a year, February 14, 2003, for plaintiff to receive an angiogram.  Plaintiff's medication has been changed; plaintiff was given nitroglycerin for 24 hours on February 14-15, 2003.  Id.  Plaintiff has had some 15 EKG's showing an infarct.  SAC, p. 15.  On February 14, 2003, defendant Penner signed a Code 2 emergency form stating that plaintiff needed medical attention elsewhere; plaintiff was taken first to a hospital in Folsom then transferred to a hospital in Modesto where the angiogram was taken.

1   Id.  On February 15, 2003, defendant OKonski[5] said there was an 80 % chance there was nothing

2   wrong with plaintiff's heart.  Id.

3          Before the medical facility at the institution learned of this litigation, plaintiff was

4   given an EKG every time he had chest pains.  SAC, p. 16.  Defendant Hooper told an M.T.A,

5   defendant Morgan, who refused to see plaintiff, that Hooper had said plaintiff probably had gas

6   or indigestion.  Id.  Ironically, defendant Hooper was the doctor on duty at the time of the Code 2

7   emergency call for plaintiff, even though he apparently believed there was nothing wrong with

8   plaintiff.  Id.  On January 3, 2003, defendant C/O Vielbig ignored plaintiff's requests for help

9   when plaintiff thought he was having a heart attack.  Id.  Plaintiff seeks injunctive relief and

10  money damages.

11  Motion for Summary Judgment

12         Legal Standard for Summary Judgment

13         Summary judgment is appropriate when it is demonstrated that the standard set

14  forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

15  there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

16  as a matter of law."  Fed. R. Civ. P. 56(c).

17         Under summary judgment practice, the moving party

18         always bears the initial responsibility of informing the district court
           of the basis for its motion, and identifying those portions of "the
19         pleadings, depositions, answers to interrogatories, and admissions
           on file, together with the affidavits, if any," which it believes
20         demonstrate the absence of a genuine issue of material fact.

21  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

22  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

23  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

24  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26         [5] Defendant Okonski has been dismissed with prejudice from this action.  See Order, filed
    on April 25, 2006.

after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete

failure of proof concerning an essential element of the nonmoving party's case necessarily

renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be

granted, "so long as whatever is before the district court demonstrates that the standard for entry

of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

　　　　　If the moving party meets its initial responsibility, the burden then shifts to the

opposing party to establish that a genuine issue as to any material fact actually does exist.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

(1986).  In attempting to establish the existence of this factual dispute, the opposing party may

not rely upon the allegations or denials of its pleadings but is required to tender evidence of

specific facts in the form of affidavits, and/or admissible discovery material, in support of its

contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

material, i.e., a fact that might affect the outcome of the suit under the governing law, see

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

　　　　　In the endeavor to establish the existence of a factual dispute, the opposing party

need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

1    56(e) advisory committee's note on 1963 amendments).

2           In resolving the summary judgment motion, the court examines the pleadings,

3    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

4    any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

5    477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

6    placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

7    at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

8    opposing party's obligation to produce a factual predicate from which the inference may be

9    drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

10   aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

11   party "must do more than simply show that there is some metaphysical doubt as to the material

12   facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

13   nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S.Ct.

14   1356 (citation omitted).

15          On multiple occasions, by orders filed on September 25, 2003, August 11, 2004,

16   September 24, 2004, and January 5, 2005, the court has advised plaintiff of the requirements for

17   opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v.

18   Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and

19   Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

20   Legal Standard for Eighth Amendment Claim

21          In order to state a § 1983 claim for violation of the Eighth Amendment based on

22   inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

23   deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

24   285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively

25   serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,

26   501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

1   1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."

2   Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

3           A serious medical need exists if the failure to treat a prisoner's condition could

4   result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

5   that a prisoner has a serious need for medical treatment are the following:  the existence of an

6   injury that a reasonable doctor or patient would find important and worthy of comment or

7   treatment; the presence of a medical condition that significantly affects an individual's daily

8   activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

9   F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

10  (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

11  grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

12          In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

13  defined a very strict standard which a plaintiff must meet in order to establish "deliberate

14  indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

15  However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

16  which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

17  Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

18  should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

19          It is nothing less than recklessness in the criminal sense—a subjective standard—

20  disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at

21  1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn

22  that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837,

23  114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

24  of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at

25  847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his

26  knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk was

1    obvious, the trier of fact may infer that a defendant knew of the risk. <u>Id.</u> at 840-42, 114 S. Ct. at

2    1981. However, obviousness <u>per se</u> will not impart knowledge as a matter of law.

3            Also significant to the analysis is the well established principle that mere

4    differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

5    Amendment violation. <u>Jackson v. McIntosh</u>, 90 F.3d 330 (9th Cir. 1996); <u>Franklin v. Oregon</u>,

6    662 F.2d 1337, 1344 (9th Cir. 1981).

7            Moreover, a physician need not fail to treat an inmate altogether in order to violate

8    that inmate's Eighth Amendment rights. <u>Ortiz v. City of Imperial</u>, 884 F.2d 1312, 1314 (9th Cir.

9    1989). A failure to <u>competently</u> treat a serious medical condition, even if some treatment is

10   prescribed, may constitute deliberate indifference in a particular case. <u>Id.</u>

11           Additionally, mere delay in medical treatment without more is insufficient to state

12   a claim of deliberate medical indifference. <u>Shapley v. Nevada Bd. of State Prison Com'rs</u>, 766

13   F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is

14   no requirement that the delay cause "substantial" harm. <u>McGuckin</u>, 974 F.2d at 1060, citing

15   <u>Wood v. Housewright</u>, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and <u>Hudson</u>, 112 S. Ct. at 998-

16   1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends

17   to provide additional support for a claim of deliberate indifference; however, it does not end the

18   inquiry. <u>McGuckin</u>, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the

19   medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

20   needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

21   the defendant." <u>McGuckin</u>, 974 F.2d at 1061.

22           Superimposed on these Eighth Amendment standards is the fact that in cases

23   involving complex medical issues where plaintiff contests the type of treatment he received,

24   expert opinion will almost always be necessary to establish the necessary level of deliberate

25   indifference. <u>See</u> <u>Hutchinson v. United States</u>, 838 F.2d 390 (9th Cir. 1988). This holds true as

26   well for establishing that actual, medical harm resulted from alleged deficient treatment. Thus,

1    although there may be subsidiary issues of fact in dispute, unless plaintiff can provide expert

2    evidence that the treatment he received equated with deliberate indifference thereby creating a

3    material issue of fact, summary judgment should be entered for defendants.  The dispositive

4    question on this summary judgment motion is ultimately <u>not</u> what was the most appropriate

5    course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment

6    was, in essence, criminally reckless.

7    <u>Discussion</u>

8           Defendants bring their motion for summary judgment on the ground that

9    defendants provided medical care and treatment to plaintiff on an ongoing basis.  Motion for

10   Summary Judgment (MSJ), p. 1.  The following facts are undisputed: plaintiff is an inmate duly

11   incarcerated within the California Department of Corrections (CDC) and housed at California

12   State Prison (CSP)-Sacramento (Sac) and at all relevant times, defendants doctors were

13   employed by the CDC and provided medical care and treatment to inmates housed at CSP-

14   Sacramento.  Defendants' Separate Statement of Undisputed Facts (DSSUF) nos. 1 and 2.

15          Plaintiff seeks primarily to dispute that, as stated in DSSUF nos. 5-7, that plaintiff

16   does not have any significant heart disease or condition, that plaintiff was never at risk of

17   suffering injury or harm as a result of any of the acts or incidents alleged in the complaint, that

18   plaintiff has received all reasonable and necessary care for his condition in conformance with

19   community standards as well as CDC policies and procedures.

20   <u>Dr. Peterson</u>

21          Defendant Peterson declares that he is duly licensed as a medical doctor and has

22   been practicing medicine for 25 years.  Peterson declaration (Dec), ¶ 2.  Plaintiff's allegation as

23   to defendant Dr. Peterson, <u>see</u> <u>above</u>, is that he is the chief medical officer at CSP-Sac, under

24   whose supervision plaintiff's Eighth Amendment rights were violated by the delayed response to

25   the medical necessity requests made on plaintiff's behalf, subjecting plaintiff to the risk of death.

26   SAC, p. 11.  Plaintiff's only outpatient visit was on July 17, 2002.  SAC, p. 12.  Defendant

1   Peterson contends that he did issue a second level 602 appeal response, on or about September

2   13, 2002, as plaintiff alleges, and for which he contends Peterson acted with deliberate

3   indifference, wherein plaintiff complained that he was not receiving adequate medical care for

4   his heart and blood pressure problems, nor was he receiving medications in a timely fashion.

5   Peterson Dec, ¶ 3.  Peterson is also correct that plaintiff generally contends that this defendant

6   should be held liable for those under his supervision.  Id.

7          According to defendant Peterson before setting forth his declaration herein, he

8   "thoroughly reviewed plaintiff's medical records to ascertain whether or not he was receiving

9   appropriate care and timely medications."  Peterson Dec, ¶ 4.  According to Peterson's review of

10  plaintiff's medical file documentation, plaintiff was prescribed medication on March 29, 2002,

11  which he received the next day, on March 30, 2002; the prescription was refilled on April 13,

12  2002.  Id.  In defendant Peterson's opinion as a doctor that "[a] one day turn around on a

13  prescription does not constitute an unreasonable delay" and put plaintiff at no further risk of

14  injury."  Id.

15         Peterson's review of plaintiff's medical file, with regard to the claim that he was

16  receiving inadequate medical care for his condition, revealed that between March 29, 2002, and

17  the time of the appeal decision on September 13, 2002, plaintiff had been examined and treated

18  on at least 11 different occasions, during at least three of which plaintiff was examined and

19  treated by a cardiologist (former defendant) Dr. Dassah.  Peterson Dec, ¶ 5.  Moreover, plaintiff's

20  treating physicians also had prescribed appropriate medications for his conditions.  Id.  This led

21  to Peterson's conclusion that plaintiff was properly under a cardiologist's care and still had

22  access to other doctors and medicines through the medical clinics; in addition, he avers, plaintiff

23  was never refused a medical examination, care or treatment.  Id.  Finally, Peterson declares that

24  the risk of future heart disease for plaintiff arises as a result of "his obesity and other lifestyle

25  choices."  Peterson Dec, ¶ 6.

26  \\\\\

1    Defendant Borges

2            Defendant Borges sets forth that he has been practicing medicine for nine years,

3    for the last four of which he has been employed by the CDC as a physician at CSP-Sac.  Borges

4    Dec, ¶ 2.  Plaintiff's allegations against defendant Borges, as stated above, are that he saw

5    Borges, on April 12, 2002, due to "very very severe chest pains."  SAC, p. 7.  Plaintiff alleges

6    that he was experiencing a pain level of 7 on a scale of 1 to 10.  Id.  Defendant Borges took

7    plaintiff's blood pressure which at 204/104 was very high.  Id.  Defendant Borges said plaintiff

8    was in danger of a heart attack or of stroking out and gave him medication, after which defendant

9    Borges was shocked when an EKG he took of plaintiff showed that plaintiff had possible heart

10   attack symptoms.  SAC, p. 8.  Defendant Borges put in an urgent request for plaintiff to see an

11   outside cardiologist.  Id.  Plaintiff claims that subsequently he was sent out of the institution five

12   times with each transport being cancelled.  Id.  Thus, defendant Borges is alleged to have been

13   deliberately indifferent to plaintiff's serious heart condition.

14           Defendant Borges concedes that he did, indeed, examine and treat plaintiff

15   on April 12, 2002, after plaintiff arrived in the clinic complaining of chest pains, but counters

16   plaintiff's allegations with the statement that he noted plaintiff had a long history of hypertension

17   and obesity and ran an EKG to determine whether plaintiff was experiencing a heart attack on

18   any other heart problem.  Borges Dec, ¶ 3.  Far from being concerned about a possible heart

19   attack at the results of the EKG, as plaintiff maintains, defendant Borges declares that "[t]he test

20   results appeared to be normal compared to prior test results."  Id.  Nevertheless, "out of an

21   abundance of caution," Borges referred plaintiff to a cardiologist; however, Borges is not

22   responsible for scheduling such appointments.  Id.  In any event, it did not appear to Borges, as

23   result of both his observation and his review of plaintiff's medical history that there was a

24   pending emergency.  Id.

25           Defendant Borges notes that plaintiff's medical file indicates that he was

26   examined by cardiologist Dr. Dassah several times, that plaintiff underwent a number of tests:

1   treadmill, Nuclear Heart Studies and other EKG's, all of which have "conclusively established

2   that plaintiff does not suffer from any apparent heart disease and has not had any heart attacks or

3   similar problems."  Borges Dec, ¶ 4.  Defendant goes on to assert that plaintiff does have a

4   "higher risk for heart disease" due to obesity, smoking and high cholesterol, but avers that these

5   factors are out of his (Borges') control.  Id.  Borges declares that he never refused to examine or

6   treat plaintiff and strove to treat him with dignity, that plaintiff has received by his professional

7   estimation, "all reasonable and medical care consistent with community standards and CDC

8   policies and procedures."  Borges Dec, ¶ 5.

9   Defendant Penner

10          Defendant Penner declares that he is a licensed medical doctor who has been

11  practicing medicine for twenty years, the last six of which he has been employed by the CDC at

12  CSP-Sac.  Penner Dec, ¶ 2.

13          Plaintiff alleges that on February 8, 2002, he experienced severe chest pains, and

14  was carried to the B-facility infirmary where he was examined by defendant Dr. Penner.  SAC, p.

15  7.  The examination included an EKG, which revealed serious cardiovascular conditions, an

16  "anterior infarct," which means there are dead or damaged muscles on the heart's surface;

17  "inferior ischemia," a result of too little oxygen reaching the heart; and "T-wave abnormality."

18  Id.  Plaintiff also suffers from high blood pressure.  Id.  The EKG results prompted defendant

19  Penner to fill out a form requesting outside medical care for plaintiff, indicating that the medical

20  attention was reasonable and necessary to protect life.  Id.  However, plaintiff was not sent to a

21  cardiologist as a result of this request and continued to suffer chest pains.  Id.  From the date of

22  the first request made for plaintiff to see an outside specialist, on February 8, 2002, it took a little

23  more than a year, February 14, 2003, for plaintiff to receive an angiogram.  On February 14,

24  2003, defendant Penner signed a Code 2 emergency form stating that plaintiff needed medical

25  attention elsewhere; plaintiff was taken first to a hospital in Folsom then transferred to a hospital

26  in Modesto where the angiogram was taken.

1    In a declaration that generally mirrors that of defendant Borges, Penner concedes

2  that he did examine plaintiff on Feb. 8, 2002, noting his history of hypertension and obesity, and

3  ran an EKG on him when plaintiff came in complaining of chest pains.  Penner Dec, ¶ 3.  Based

4  on the EKG test, Penner referred plaintiff to a cardiologist.  Id.  Like defendant Borges,

5  defendant Penner does not schedule cardiology appointments and had no control over when

6  plaintiff might be seen.  Id.  The referral was made on a non-emergency basis and defendant

7  Penner would have expected the appointment to be made in the normal course of business.  Id.

8  Defendant Penner states that he has included a copy of his referral attached as Exhibit A;

9  however, this court finds no such referral.  Id.

10    The remainder of the declaration echoes that of the other physician defendants,

11  averring that plaintiff was never at "'great risk'" of harm or injury as a result of the incidents

12  described in plaintiff's allegations and that plaintiff's higher risk factor comes from his obesity,

13  smoking and high cholesterol.  Penner Dec, ¶¶ 4, 5.

14  Opposition

15    Plaintiff begins his opposition by saying that inmates are subjected to

16  unconstitutional violations with no representation in court when they bring their claims seeking

17  redress, unlike defendants, who have counsel.[6]  Opp., p. 1.  Plaintiff contends that when

18  

19  
[6] As the undersigned noted in the earlier Findings and Recommendations on defendant
Dassah's dispositive motion, although the court denied plaintiff's single request for appointment

20  of counsel, the decision was predicated in no small part on the apparent dearth of voluntary
counsel available for prisoner civil rights actions in this division of the Eastern District of

21  California.  See Orders, of which this court takes judicial notice, filed on 1/13/06 in Pogue, et al.,
v. Woodford, et al., Case No. CIV-S-05-1873 MCE GGH P; on 1/4/06 in Consiglio v. Woodford

22  in Case No. CIV-S-05-1701 GEB GGH P; on 12/23/05 in Allison v. Khoury, et al., Case No.
CIV- S-05-0547 GEB GGH P; on 10/25/05 in Lynn v. Argro, Case No. CIV-S-04-0543 LKK

23  GGH P; on 9/20/05 in Jennings v. Faulker, et al., Case No. CIV-S-04-2131 GEB GGH P; also on
9/20/05 in Meyers v. Pope, et al., Case No. CIV-S-03-0241 LKK GGH P.  These are some of the

24  cases in which the King Hall Civil Rights Clinic did not respond to orders (often repeated) to
inform the court as to whether the case at issue was appropriate for counsel and whether they

25  would be able to represent the plaintiff prisoner.  This note only references cases assigned to the
undersigned and even at that does not include the number of cases so assigned wherein the clinic

26  has actually responded but indicated that their docket is too full to accept appointment of
counsel.

14

1  defendants Borges and Penner filled out the medical forms for requests for outside medical

2  attention that, far from being routine as defendants declare herein, the doctors were alerted to the

3  [imminent] possibility of a stroke or heart attack and believed there was nothing routine about a

4  blood pressure reading of 204/106.  Opp., p. 3.  Plaintiff's Exhibit A consists of two

5  unauthenticated copies of what appear to be requests for outside medical consultant services.

6  Both are marked "urgent," with one appearing to state that plaintiff needed a "cardio" service,

7  presumably an EKG?, and the other requesting an "exercise, nuclear imaging."  Plaintiff

8  contends that one of the doctor defendants (without saying whom) stated that "they did not want

9  me dieing [sp] on their watch."  Opp., p. 3.  Plaintiff further warrants, although he produces no

10  documentation in support, authenticated or not, that on the back side of these forms there was a

11  statement indicating that the request was made "to protect life."  Id.  Further, plaintiff points to

12  Exhibit B, a copy of a November 10, 2004, Director's Level appeal response, wherein "[t]he

13  institution states that the appellant does have a history of chest pains relieved by nitroglycerin

14  and ... EKG's show either an anterior wall heart attack or middle wall heart attack."[7]   Plaintiff

15  avers that this is the assessment of defendant Penner and appears to believe that this is his, as it

16  were, smoking gun.  He condemns the actions of all of the defendants.

17  Defendants Wedell, Sharp, Hooper, Vielbig, Morgan and Cesaro

18         As to the remaining defendants, Wedell, Sharp, Hooper, Vielbig, Morgan and

19  Cesaro, defendants argue that "[b]ecause plaintiff does not have any significant heart disease or

20  _____

21      Moreover, neither the undersigned, nor the court, maintains a list of available attorneys.
On several occasions, the court has attempted to interest attorneys into becoming members of a

22  pro bono panel, to no avail.  There are simply no volunteer counsel for this type of case at the
trial level.  Nor will the undersigned beg and cajole attorneys to take the case.

23      [7] In plaintiff's opposition to the motion for summary judgment by defendant Dassah,
plaintiff included a copy of an August 9, 2004, second level emergency appeal response, which

24  was a partial grant signed by CSP- Sacramento's Chief Medical Officer, John Howard, (not a
defendant) and which, inter alia, included the following statement: "You do have a history of

25  chest pain relieved by nitroglycerin and EKGs that show either an anterior wall heart attack or
middle wall heart attack."  Plaintiff makes the following note on the exhibit: "undeniable proof a

26  [sic] expert has confirmed plaintiff's contentions."

1    condition, he was never 'at substantial risk of serious harm,'" and these defendants are, also,

2    therefore, entitled to summary judgment.  MSJ, p. 7.

3                                      Discussion

4              As this court noted in recommending summary judgment for defendant Dassah,

5    this is a troubling case in that plaintiff has not been able to provide authentication and expert

6    testimony in support of his allegations, which is a not infrequent consequence simply of being a

7    prisoner proceeding pro se.   Fed. R. Civ. P. 56(e) provides in relevant part that,

8                 Supporting...affidavits shall be made on personal knowledge, shall set forth such
                  facts as would be admissible in evidence, and shall show affirmatively that the
9                 affiant is competent to testify to the matters stated therein.  Sworn or certified
                  copies of all papers or parts thereof referred to in an affidavit shall be attached
10                thereto or served therewith...

11             "It is well established that unauthenticated documents cannot be considered on a

12   motion for summary judgment."  Hal Roach Studios v. Feiner, 896 F.2d 1524, 1550 (9th Cir.

13   1989).  "To be considered by the court 'documents must be authenticated by and attached to an

14   affidavit that meets the requirements of [Rule] 56(e) and the affiant must be a person through

15   whom the exhibits could be admitted into evidence.'"  Id., quoting Canada v. Blain's Helicopters,

16   Inc., 831 F.2d 920, 925 (9th Cir. 1987).  "A document which lacks a proper foundation to

17   authenticate it cannot be used to support a motion for summary judgment."  Id..

18             The copies of what appear to be medical records that plaintiff has attached to his

19   opposition and separate statements are not properly authenticated.  Accordingly, the court may

20   not consider them in evaluating defendants' motion.  King v. Aliyeh, 814 F.2d 565, 567 (9th Cir.

21   1987) (pro se litigants must follow the same rules of procedure that govern other litigants).  This

22   court is not in a position to interpret medical tests, even if the documents were properly

23   authenticated.  On the other hand, the court will consider the statement included in the August 9,

24   2004 response, previously noted in the February 3, 2006, Findings and Recommendations (on

25   Dassah's dispositive motion) wherein the CMO states that plaintiff has a history of chest pain

26   and evidence of some form of a heart attack and also will consider the copy plaintiff has

                                            16

1   submitted of the November 10, 2004 Director's Level response which also recognizes that

2   plaintiff has had a heart attack of some form.

3            On the other hand, other than their own expert testimony in their own defense,

4   defendants produce no supporting documentation, in the form of medical reports or records; for

5   example, defendant Peterson states that his review of plaintiff's medical file documentation

6   indicates that he was prescribed medication on March 29, 2002, which he received the next day,

7   on March 30, 2002; the prescription was refilled on April 13, 2002.  Defendant Peterson does not

8   supply the underlying documentation in support of that assessment, which would appear to have

9   been simple enough to do.  However, in his opposition plaintiff does not refute the one-day turn

10  around on receipt of the medication.  Defendant Peterson's entitlement to summary judgment lies

11  largely in the fact that plaintiff's claim against him of supervisory liability is inadequate.

12           As to defendants Borges and Penner, however, their declarations merely raise an

13  issue of fact with regard to the question of whether or not, as plaintiff maintains and defendants

14  deny, plaintiff has or had a serious heart condition for which he received adequate medical

15  treatment.  Defendant Penner does not deny that it was his finding, through at least one EKG,

16  that plaintiff had an anterior wall or middle wall heart attack (at some point), does not even

17  include a copy of his referral which is incorrectly asserted in his declaration to have been

18  attached as an exhibit, and does not even address plaintiff's allegation that he had authorized a

19  Code 2 emergency for plaintiff in February of 2003.  Nor does defendant Borges adequately

20  reconcile a finding that plaintiff did not have a significant heart condition with the institution's

21  own finding (as reported in a second and third level appeal response, previously noted).  Thus,

22  there is not much doubt in this record that plaintiff has established issues of fact that he had a

23  serious medical condition, and that the various doctors/medical personnel reacted indifferently to

24  that condition.  However, that is not the end of the motion because it is also clear that plaintiff

25  has not supplied specific facts that any delay in treatment caused *actual harm* to plaintiff either in

26  the way of further heart damage, or *unavoidable* pain.  No expert testimony suggests that plaintiff

1  suffered any heart attack during the time period that defendants treated him.  Although, as

2  referenced earlier, there is conflicting evidence concerning whether plaintiff ever suffered a heart

3  attack, assuming that plaintiff did incur heart wall damage, no evidence indicates that this was

4  other than an old infarct event which later ECGs (EKGs) picked up (as they normally would).

5  While it is possible that plaintiff suffered a heart attack early on in the course of some of

6  defendants' treatment, a mere speculated possibility is insufficient to require a case to go to trial.

7  And, when testing was finally performed on plaintiff, the "treadmill, Nuclear Heart Studies, and

8  other EKGs" established at the very least that plaintiff had not suffered any further damage to his

9  heart, and indeed, suggested that plaintiff had never suffered such damage.

10          The court is reduced, as courts often are, in granting summary judgment because

11  no jury could find that plaintiff was actually harmed by any delay in treatment.

12          While the lapses in medication, treatment and testing alleged by
            Howard, if true, are disturbing, Howard fails to show how he was
13          injured by them. As noted above, in assessing an Eighth
            Amendment claim, a court may consider the actual harm that
14          resulted from defendant's alleged indifference to an inmate's
            serious medical needs. Maldonado, 28 F.Supp.2d at 289-290.
15
            Plaintiffs' expert opines that Howard may have been injured in two
16          ways from the lapses in his HIV medications: (1) Howard may
            have contracted CMV, and (2) Howard may have developed
17          resistance to some of his HIV medications.  These suppositions are
            unsupported by evidence.  There is no evidence that Howard
18          indeed suffered or suffers from CMV or developed resistance to
            any HIV medications.  Unsupported allegations are not sufficient
19          to survive a motion for summary judgment.  See Quiroga v.
            Hasbro, Inc., 934 F.2d 497, 500 (3d Cir.1991) (to repel a motion
20          for summary judgment, the non-moving "party must do more than
            simply show that there is some metaphysical doubt as to the
21          material facts. It must set forth specific facts showing a genuine
            issue for trial and may not rest upon mere allegations...").
22

23  Jackson v. Fauver, 334 F. Supp. 2d 697, 718 (D.N.J. 2004).

24          Moreover, nothing in this record suggests that defendants were deliberately

25  indifferent in causing plaintiff further ischemia regardless of whether actual harm resulted.

26  Without bypass surgery, something that is not even hinted at here as necessary, ischemia will

1  come and go, and there is little a doctor can do to "cure" such pain, i.e., permanently eradicate

2  the pain.  While medication can be given to rectify ischemic pain on an episodic basis, the facts

3  of this case indicate that plaintiff was given such medication.

4       Accordingly, IT IS HEREBY RECOMMENDED that the September 23, 2005,

5  motion for summary judgment, filed by defendants Peterson, Penner, Borges, Wedell, Sharp,

6  Hooper, Vielberg, Morgan and Cesaro, be GRANTED.

7       These findings and recommendations are submitted to the United States District

8  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

9  days after being served with these findings and recommendations, plaintiff may file written

10  objections with the court.  Such a document should be captioned "Objections to Magistrate

11  Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections

12  within the specified time may waive the right to appeal the District Court's order.  Martinez v.

13  Ylst, 951 F.2d 1153 (9th Cir. 1991).

14  DATED: 8/2/06

                                        /s/ Gregory G. Hollows
15
                                        _____
16                                      GREGORY G. HOLLOWS
                                        UNITED STATES MAGISTRATE JUDGE
17  GGH:009
    west2621.msj2
18

19

20

21

22

23

24

25

26

19